UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MARDY RINGO, an individual,

        PLAINTIFF,

    VS.

ENCO LOGISTIC SERVICES, LLC, a
ennessee Limited Liability Company, and
lars, Inc., David Jabaley, Mario Lopez

      Defendants.

16-2093

# FILED

APR – 5 2016

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

1

**NOW COMES PLAINTIFF, Mardy RINGO** (hereafter "RINGO") and hereby brings her complaint against defendants **KENCO LOGISTICS SERVICES, LLC**, a Tennessee, Limited Liability Company (hereafter "KENCO"), and alleges as follows:

## I.
## NATURE OF THE ACTION

1.         The action is brought to remedy the violations of DOSS's civil rights and to redress the unlawful and discriminatory employment practices of the KENCO. This action arises out of the conduct of KENCO's employees and its employment practices of (1) Unequal terms and condition of employment for unequal pay; (2) A. Harassment based in whole or in part  upon his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16 et seq., and the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991 and 42 U.S.C. §1981, (3)  B. Harassment based upon retaliation for making an internal and external complaints of discrimination. (4) C. Harassment based in whole or in part upon his disability in violation of The Americans with Disabilities Act, 42 U.S.C. § 12101 and/or The Rehabilitation Act, 29 U.S.C. § 701. (5) Harassment based in whole or in part upon his age in violation of The Age Discrimination in Employment Act, 29 U.S.C. § 621)

2

## II.
## JURISDICTION

1.      This in part, an action authorized and instituted pursuant to the Civil Rights of 1964, 42 U.S.C. §2000e, et seq.; the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981; 42 U.S.C. 1981A, 42 U.S.C. §1988 Illinois common law.

2.      The jurisdiction of this court is predicated upon 28 U.S.C. §§1331 and 1343, to redress the unlawful deprivation of Plaintiff's rights secured, guaranteed and protected by federal law.  The Court also has jurisdiction pursuant to 28 U.S.C. §§2201 and 2202 relating to declaratory judgments.  This Court may also exercise pendent jurisdiction over Plaintiff's state law claims arising from a common nucleus of operative facts pursuant to 28 U.S.C. 1367.

## III.
## VENUE

3.      Venue is proper in the United States District Court for the Central District of Illinois, Eastern Division pursuant to 28 U.S.C. 1391 (b) wherein RINGO lives and where KENCO regularly conducts business and where are wrongful conduct complained of herein occurred.

## IV.
## THE PARTIES

### PLAINTIFF

4.      RINGO is a citizen of the United States and is an Caucasian female and at all relevant times herein; he has resided in Illinois, in the County of Kankakee and was an employee of KENCO within the meaning of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and applicable case law.

5.     RINGO was employed with KENCO and its predecessors, whom at all times acted as agents of Mars, Inc. since on or about July 2009 through various 3rd party management companies; beginning with 4T's Management Company and then with KENCO since April 2013.

## DEFENDANT

6.     At all relevant times herein, Defendant KENCO was a 3rd party Logistics management servicing agent for Mars, Incorporated employing over 3000+ employees nationwide and is a Tennessee Limited Liability Company. KENCO maintained an office in Manteno, Illinois and currently maintains offices in Bolingbrook and Channahon, Illinois, and conducts business within the State of Illinois and Cook and Will County and within the judicial district. Defendant KENCO'S primary place of business is in Chattanooga, Tennessee and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, et seq..

## V.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

RINGO has complied with the administrative prerequisites of §506 of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5 as follows:

7.     On or about, December 15, 2014, RINGO timely filed a formal charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2015CA1590 and 21B201500524, respectively.

8.     RINGO promptly and diligently accommodated all IDHR and EEOC requests for information and fully cooperated in the agency's investigation of this matter.

4

9.      RINGO has exhausted all available administrative remedies in accord with the aforementioned statutes prior to instituting this Civil Action, and RINGO formally requested a Notice of Right to Sue from EEOC on January 4, 2016.  No administrative prerequisites are required before a plaintiff files a complaint pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

## VI.
## FACTUAL ALLEGATIONS

10.     RINGO was employed with predecessors of KENCO on or about July 2009 as a Spotter, for 3rd party management company whom at all times acted as agents of Mars, Inc., beginning with 4T's Management Company and then with KENCO on April 21, 2013 at the Mars' warehouse in Manteno, Illinois.

11.     RINGO was given a letter of experience from Mars, Inc. former managing agent 4T's, to be given to KENCO, as a prerequisite to continued employment at the Mars, Inc. Manteno facility.

12.     A perquisite to continued employment was a valid CDL-Commercial Driver's License.

13.     RINGO possessed a valid CDL as required for the Spotter's position.

14.     Department of Transportation (DOT) mandates physical testing.

15.     A DOT physical exam is valid for up to 24 months.

a.      The medical examiner may also issue a medical examiner's certificate for less than 24 months when it is desirable to monitor a condition, such as high blood pressure, in this case diabetes.

16.    RINGO was issued a one (1) year DOT card.

17.    The DOT medical examiner did not impose any other restrictions on RINGO.

18.    At all relevant times, Defendant KENCO employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

19.    At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of RINGO's employment were governed and controlled by Defendant KENCO under the specific direction and management of Mars, Inc.

20.    Pointedly, KENCO admitted through and in its verified responses to the Illinois Department of Human Rights that it "operates and manages warehouses and order fulfillment operations for other companies."

They go onto say "On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc.  While the Manteno facility was in operation prior to April 13, 2013, it was managed by a different 3PL."

21.      KENCO, upon information and belief was acting as the agent of Mars and in its conduct and actions as alleged herein and was acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by Mars.

22.     Mars, Inc. and KENCO Logistics an entity of the KENCO Group have both admitted before the court that they are privately held companies, separate from one another, with no real or tangible interest in one another.

23.     At all relevant times RINGO possessed the skills, experience and qualifications necessary to work in his employment position and adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendant KENCO.

24.     At all times, David Jabaley, ("Jabaley"), a White, American male, held the position of Director of Operations at Kenco Logistics a part of the Kenco Group. Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of RINGO's employment with Defendant KENCO.

25.     At all relevant times, Jabaley, acting on behalf of Kenco Corporate the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

26.     At all times, Mario Lopez, ("Lopez"), a White, American male, held the position of General Manager at the Mars, Inc. Manteno facility. Lopez was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of RINGO's employment with Defendant KENCO.

27.     At all relevant times, Lopez, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

7

28.     At all times relevant, Mike Manzello, ("Manzello"), a White male, held the position of Operations Manager at the Mars, Inc. Manteno facility, reporting to Jabaley of Kenco Logistics.  Manzello was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of RINGO's employment with KENCO the managing agent for Mars, Inc. and the Mars, Inc. Manteno facility.

29.     At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

30.     At all times relevant, Melissa Hansen, ("Hansen"), a White female, held the position of Co-Pack Coordinator at the Mars, Inc. Manteno facility, reporting to Jabaley of Kenco Logistics.  At all times relevant, Melissa Hansen, ("Hansen"), a White female, held the position of Operations Manager at the Mars, Inc. Manteno facility, reporting to Lopez. Hansen was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of RINGO's employment with KENCO the managing agent for Mars, Inc. and the Mars, Inc. Manteno facility.

31.     At all relevant times, Hansen coordinated operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

32.     At all times relevant, William Schwerin, ("Schwerin"), a White male, held the position of Facility Manager of the Mars, Inc. Manteno facility, reporting to Jabaley of Kenco Logistics and then to Lopez.  Schwerin was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of RINGO's employment with KENCO the managing agent for Mars, Inc. and the Mars, Inc. Manteno facility.

33.    At all relevant times, Schwerin with the exception of the computers and server, that was also owned by Mars, Inc. and managed by the IT department managed the operational activities relative to the facility, the spotters, all equipment, equipment certification, maintenance, up keep and the like for the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like. The facility, all the equipment, and the like was provided, leased and/or owned by Mars, Inc.

34.    On or about June 2014, ads were placed on job boards soliciting help wanted for spotter positions. This by Leonard Szplett Office/Accounting/HR Manager.

35.    Beginning in June 2014, younger white male spotters were hired at a higher rate of pay, as well as, being given premium shifts, than tenured African American, spotters over 40.

36.    John Montgomery, non-black, Caucasian, unqualified for the spotter position, performed spotter duties and was paid more than RINGO and other African American spotter's.

37.    Beginning in July 2014, RINGO was denied the opportunity to engage in overtime when other new non-black hires of June/July 2014 were given 40 hours and overtime.

38.    Montgomery, non-black, Caucasian, unqualified spotter enjoyed excessive overtime when RINGO, a qualified spotter was denied overtime.

39.    On or about July 2014 RINGO complained and expressed his opposition to being paid less and denied overtime, as well as, the nepotism and favoritism shown towards white, non-black, non-African Americans that had been hired after RINGO that were given more favorable shifts and better pay.

40.    RINGO waged these complaints to Manzello, Schwerin, Jabaley and the onsite Human Resource personnel, Edith McCurry, HR Administrator and Leonard Szplett, Office/Accounting/HR Manager.

41.    After RINGO began questioning, complaining and reporting the matters to onsite HR and management, his shifts began to become routinely changed, for the stated reason that it was a business need.   These shift changes were not based on seniority.

42.    In addition, RINGO continued to be the victim of unequal terms and condition of employment in that he was subjected to a disparity in his rate of pay relative to similarly situated white, non-black, non-African American co-workers, with less seniority and qualifications.

43.    Shortly thereafter in August 2014, in retaliation for engaging in protected activity and opposing such treatment, RINGO was assigned a less favorable shift by being demoted to second shift.  Upon information and belief, similarly situated, white, non-black and non-African-American co-workers, including new-hires, of RINGO were afforded better shift opportunities and better wages despite seniority.

44.    RINGO again expressed his opposition to being paid less, being denied overtime, and being assigned less favorable shifts to Manzello, Schwerin, Jabaley and

on site Human Resource personnel, Edith McCurry, HR Administrator and Leonard

Szplett, Office/Accounting/HR Manager.


45.     In further retaliation, harassment, intimidation, and imposed continued economic sanctions and deprivation, as well as, conspiracy Defendant contrived a scheme to willfully and intentionally subjugate RINGO to frequent unscheduled and non-mandated diabetic testing, by coercing RINGO into taking frequent diabetic and drug testing as a term and condition of employment.


46.     Upon information and belief, Mars, Inc. manager, KENCO allowed similarly-situated, non-black, non-African American co-workers of RINGO, who were diabetic, to be exempt from taking unscheduled diabetic tests.


47.     RINGO had not had any previous uncontrollable diabetic conditions and had been diabetic prior to Kenco Logistics management of the Mars, Inc. Manteno facility in 2013.


48.     RINGO's diabetic condition had never precluded him from performing his job.


49.     RINGO's physician has never deemed his diabetic condition out of control or going in the wrong direction.


50.     Diabetic testing should be performed under specific parameters to ensure accurate test results.


51.     RINGO's frequent unscheduled diabetic testing did not conform to the recommended testing parameters for accurate test results.


52.     RINGO was accused of being hostile, angry and aggressive because he opposed being forced to take numerous non-mandated diabetic testing under the

circumstances of being coerced and intimated into doing so under the threat and duress of being discharged for failing to comply.

53.    RINGO continued to be further subjected to other forms of disparate treatment and harassment, after RINGO continued to question, complain and report the matters to onsite HR and management, such as but not limited to harsher discipline and closer scrutiny than his similarly situated, white, non-black, non-African American co-workers.

54.    RINGO began be subjugated to various sorts of write-ups; write-ups for situations and instance that other similarly situated, white, non-black, non-African American co-workers had done and were doing, but were not written up for.

55.    RINGO's write-ups were capricious in nature and did not follow Defendant's own company policy.

56.    For example, RINGO was written up for being in an altercation with another Spotter stating that both were using profanity amongst other things.

57.    Mars, Inc. manager, KENCO submitted this write-up to the Illinois Department of Human Rights.

58.    Respondent was asked for all disciplinary actions incurred by all of the spotters by the Illinois Department of Human Rights.

59.    Respondent gave the Illinois Department of Human Rights write-ups (OFI's) for non-similarly situated persons to RINGO.

60.    The write-ups supplied by Respondent did not even meet Respondent's own procedures as it relates to its progressive disciplinary actions.

61.     Respondent indicated that only one (1) spotter had a verbal warning and it was the spotter involved in the altercation with RINGO.

62.     All verbal warnings are written warnings according to Defendant's company policy.

63.     Respondent did not produce the write-up allegedly given to the spotter referenced to the Illinois Department of Human Rights as having been given a verbal warning.

64.     Respondent indicated that there were no other write-ups (OFI's) for any other spotter's.

65.     Respondent's evidence to the Illinois Department of Human Rights regarding one of it numerous write-ups for RINGO indicated that he and another spotter were involved in an altercation.

66.     Respondent to date did not produce the write-up that should have been given to the other spotter who was involved in this altercation.

67.     Respondent's other spotter involved in the alleged altercation was white, non-black, non-African American, as Respondent's only other African American Spotter was on disability at the time; therefore, it could not have been him.

68.     Pointedly, Respondent failed to discipline its white, non-black, non-African American spotter, as it had disciplined RINGO for the same alleged infraction; respondent violated its own company and public policies by blatantly discriminating.

69.     Respondent's actions of failing to discipline its white, non-black, non-African American employees encouraged and fostered a continuous animus,

hostile, volatile, and racially charged atmosphere and work environment Mars, Inc. Manteno facility.

70.    Respondent knowingly and willfully purported and imputed racial discrimination and adverse employment decisions towards RINGO and other African Americans and those who opposed such treatment and impact.

71.    Contrarily, upon information and belief, Respondent produced a Mars, Inc. Investigation report to the Illinois Department of Human rights in Charge NO: 2015CF0310 when it believed the initiator and instigator was African American.

72.    Specifically, Mars, Inc. manager, KENCO, agent for Mars, Inc., was to follow a progressive disciplinary policy, specifically Opportunity for Improvement non-discriminately, but again willfully and woefully choose to violate its own policies.

73.    Mars, Inc. manager, KENCO has proffered another prime example of its disparate and disparaging treatment and impact by enforcing harsher discipline on RINGO, an African American, and other African Americans and those who opposed such treatment and impact.

74.    Pointedly this is the same behavior exercised by Mars, Inc. manager KENCO in Brown vs. Kenco Logistics Case number 3:10-cv-00668.

75.    On or about the weekend of August 31, 2014, Carl Metke was allowed to work as a spotter; at a higher prevailing rate than RINGO.  A holiday weekend, no less. Upon information and belief, Carl Metke at that time, was not an employee of Mars Manteno facility, managed by Kenco.  Metke had not been vetted according to Mars, Inc. managers, KENCO's Standard Operating Procedure (SOP) as it relates to hiring, as well as, the Federal Mandates of the Food Safety and Modernization Act (FSMA) and the Bioterrorism Act of 2001 (BOA), as well as, any other applicable regulations or mandates.

14

76.    On or about September 2, 2014, RINGO complained to Manzello and onsite Human Resource Personnel, Edith McCurry, HR Administrator and Leonard Szplett Office/Accounting/HR Manager, about the job assignment, the lack of overtime being disseminated as RINGO had five (5) years plus of service to the company; more seniority than the new non-black hires as spotters who had more favorable work shifts, better pay for working in the same capacity without being subjugated to frequent diabetic and drug testing, as a term and condition of employment.

77.    Upon information and belief, RINGO's alteration in shift and opportunities to overtime was against the normal practices of the Mars, Inc. manager, KENCO with respect to such alleged discrepancies and as such, violated Defendants normal due process afforded to affected parties.

78.    Mars, Inc. manager, KENCO punitive actions directed toward RINGO was motivated by a racial animus, discrimination and retaliation, and was unjustified and violative of his rights under Federal and the state of Illinois anti-discrimination laws.

79.    Upon information and belief, RINGO's similarly situated, white, non-black, non-African American co-workers were not subjected to humiliation, harassed, and punished in such a manner. Additionally, upon information and belief, Plaintiff and another African American were the only staff in his Department affected by the humiliation, harassment and punitive measures directed toward them.

80.    None of RINGO's similarly situated, white, non-black, non-African American co-workers were humiliated, harassed and subjected to such punitive measures and tactics.

81.    Pointedly they were rewarded with better pay, more favorable shifts, more opportunities and fringe benefits, and advancement.

82.    Mars, Inc. manager, KENCO's policies dictate that when such infractions and discrepancies occur within the facility, proper company protocol and procedure is to be followed as it relates to the Standard Operating Procedure.

83.    Specifically, Defendant KENCO, agent for Mars, Inc., failed to follow their own various employment policies, as it relates to harassment, retaliation, discrimination and the like, as well as, public policy.

84.    Upon information and belief, Mars, Inc. manager, KENCO, hired Kelly Campbell, a diabetic, in 2013, a white, non-black, non-African-American, male Spotter.  Campbell was not subjugated to such discriminatory, unequal terms and conditions of his employment as was RINGO.

85.    Mars, Inc. manager, KENCO also hired external candidates for the Spotter's position. These similarly situated, non-black, non-African American co-workers of RINGO were Mark Baker, Carl Metke, and Tom Leach whom were hired during the period of the  of 2013 to 2014.  None of these persons were subjected to such discriminatory, unequal terms and conditions of their employment as was RINGO.

86.    Mars, Inc. manager, KENCO's Spotter, John Montgomery, White male, failed to meet Defendant's minimum qualifications as a Spotter in as much as he did not have a CDL (Commercial Driver's License) to operate a Semi-Trailer Truck, but was hired as such; was paid the over the prevailing rate of a Spotter and was given first shift Monday-Friday.

87.    Mars, Inc. manager, KENCO's newly hired and or promoted, non-black, non-African American Spotter's received prevailing pay and more favorable assignments and shifts than RINGO and other similarly situated African Americans.

88.    Such pervasive and blatant discriminatory, hostile and disparate treatment by Mars, Inc. manager, KENCO, gave rise to a rash of harassment from other employees and subordinates.

89.        RINGO, along with those who opposed such treatment, were subjected to discriminatory and retaliatory treatment.

90.        RINGO a five (5) year veteran spotter with the second amount of seniority had yet to be trained on the window, as window clerk.

91.        Defendant Kenco made Cross training mandatory in accordance with the written quality management system.

92.        On or about September 15, 2014 RINGO requested to be trained on the window.  An interchangeable positon with the spotters.

93.        RINGO was denied training by Stacey Bushey, the second shift supervisor.

94.        RINGO stated that he continually felt discriminated against, as more recent non-black. Non-African-American hires were trained on the window, paid better wages, and given better opportunities to shifts, overtime, and advancement, as well as, not being subjugated to frequent drug and diabetic testing, lengthy return to work form testing and harsher scrutiny and discipline.

    a.  Mark Baker, a spotter, a similarly situated, non-black, non-African-American, co-worker of RINGO was hired in mid-2013, clearly after RINGO, was trained on the window.

    b.  Pointedly, not only was Mark Baker trained on the window, but Mars, Inc. manager KENCO accommodated Baker to work on the window beginning in November 2013 indefinitely due to a disability he incurred since beginning work at the Mars, Inc. Manteno facility.

95.     Stacey Bushey reported RINGO's complaints of discrimination to Lopez on or about September 15, 2104.

96.     On or about September 15, 2014, RINGO made these same complaints to Lopez after complaining to Bushey that he continually felt discriminated against, as more recent white, non-black, non-African-American hires were trained on the window, paid better wages, and given better opportunities to shifts, overtime, and advancement, as well as, not be subjugated to frequent drug and diabetic testing, lengthy return to work form testing and harsher scrutiny, discipline and the like.

97.     Lopez stated the "if {he} RINGO came and complained about being discriminated against again, that {he} Lopez would start the process to terminate {him} RINGO.

98.     Mars, Inc. manager, KENCO, alleged to the Illinois Department of Human Rights that RINGO was only denied training that day.

99.     Mars, Inc. manager, KENCO, continued to minimalize RINGO by suggesting to the IDHR that RINGO was so rudimentary, childlike, austere and demanding to believe that there was not a process or protocol to be followed in regards to training.

100.     Pointedly RINGO did not ask for training in the context of that particular day only; RINGO inquired about being trained on the window as any other employee would.

101.     RINGO continued to request training.

102.     RINGO was not trained on the window until December, several months later.

103.    RINGO was continually subjugated to greater scrutiny and harsher discipline.

104.    To further belabor the grotesque and egregious actions of Defendant Kenco, an agent of Mars, Inc., and its agents, KENCO would mandate RINGO to remain home until the test results were given; sometimes days a time.

105.    No other similarly situated white, non-black, non-African-American co-workers, that included recent hires, under the age of 40 (forty) were subjugated to such treatment and terms and conditions of employment.  Often times, the white, non-black, non-African-American co-workers, were never even tested, as mandated by company policy.

106.    As a direct result, of this contrived, willful and intentional infliction of emotional and economic distress and duress, of being denied access to overtime, like the white, non-black, non-African-Americans, coupled with the continued pervasive and blatant discriminatory, hostile and disparate treatment, RINGO continued to fall prey to further punitive economic sanctions and deprivation, as well as, great emotional duress and stress.

107.    Upon information and belief from May until September of each year overtime is mandated by the Mars, Inc.; employees can work in excess of 30 hours of overtime per week.

108.    Specifically Montgomery, an unqualified spotter without a CDL, worked 24 hours straight.

109.    Mars, Inc. manager, KENCO, and its various agents in turn became more openly hostile, retaliatory and discriminatory towards RINGO as well as other black and African American employees and those who opposed such disparate and

19

disparaging treatment, encouraging supervisors, leads and other non-black, non-African workers under their management to do likewise. This included but was not limited to all phases of employment, i.e.: hiring, discharge, performance management, conditions of employment, promotion, paid time off, furlough/leave of absences, discipline, work shifts, benefits, and wages.

110.    At the point when RINGO filed his formal complaint of discrimination with the Illinois Department of Human Rights, Mars, Inc. and its manager Kenco Logistics were fully aware that a systematic pattern and practice of discrimination existed, as it had been served in excess of twenty-five (25) charges from the Illinois Department of Human Rights.

111.    Despite Mars, Inc. manager, KENCO, being apprised and engaged in the ongoing violation of employees protected rights, KENCO sought every opportunity to treat RINGO and others unfairly in relation to his similarly situated, white, non-black, non-African American co-workers, who did not oppose disparate and disparaging treatment of African Americans.

112.    Pointedly, Mars, Inc. nor its manager, KENCO, did anything to quail, quash, mitigate, or remediated the disparate treatment and impact imputed upon African Americans and those who opposed such.

113.    Contrary to company and public policy, Mars' manager Kenco Logistics continued to foster and encourage a racially animus and hostile work environment, by failing to remediate and sanction the behaviors.

114.    Heinously and odiously these irreparable harms were committed, encouraged and/or condoned by KENCO Logistics Corporate employees, such as but not limited to: David Jabaley, Corporate Director of Operations and Tammi Fowler, Senior Manager of Employee Relations.

115.    Pointedly, Mars, Inc. did nothing as well to bring corrective action to its manager, Kenco Logistics or ameliorate the disparate and disparaging treatment and impact upon its employees.

116.    The harassment and discrimination followed the complaint to corporate, management and Human Resources, as well as, the onsite Human Resource Personnel within such a period of time as to raise an inference of retaliatory motivation.

117.    RINGO was paid an hourly rate and at times eligible bonuses. As part of his employment compensation package, he also received or was entitled to medical benefits, insurance, Paid Time Off and overtime as well as other benefits.

118.    RINGO was continually harassed and retaliated against throughout his tenure of employment with Mars, Inc. manager, KENCO.

119.    While employed by Mars, Inc. and its manager, KENCO, RINGO was the victim of race, age, disability discrimination, harassment, retaliation coercion, conspiracy, willful and intentional interference, as well as, a hostile and animus work environment. RINGO is an African American male.  Due to his race, age and disability he was treated differently from other similarly situated non-black, non-African American employees in the terms and conditions of his employment. Upon information and belief, RINGO alleges that he and other African American co-workers belonging to protected classes pursuant to the federal and the state of Illinois anti-Employment Discrimination laws were held to different standards than other employees of Defendant.

120.    RINGO upon information and belief, alleges that African Americans and other employees that are members of the protected class have substantially lower employment and retention rates at the Mars, Inc. Manteno facility managed by KENCO, due to unfavorable terms, conditions and privileges of employment, such as: (1) lack of equal opportunity; (2) unfair and poor treatment; and (3) less tolerance and leniency when making adverse employment decisions, amongst other things. RINGO

believes KENCO has a disproportionately lower number of African American employees in various management level positions.

121.     RINGO, upon information and belief, alleges that there were substantially more non-African American employees, especially in management level positions, at the Manteno facility, as well as, other facilities.   The non-African American employees at the Manteno facility were treated much more favorably than RINGO and other African American employees.

122.     From 2014-2015, RINGO was unfairly singled out and treated differently from his non-African American colleagues due to his race, age and disability.  RINGO's employment eventually ended on February 28, 2015.  The reason given by Mars, Inc. manager, KENCO for RINGO's discharge was the early termination of Mars, Inc. manager, KENCO's contract with Mars. Inc.; upon information and belief, for breach of contract.

123.     In 2015, Mars, Inc. manager, KENCO, knowingly and willfully submitted false, inconsistent, capricious and misleading information to Regulatory and Public Policy agencies.  Such as, but not limited to Illinois Department of Human Rights.

124.     Mars, Inc. manager, KENCO actions toward RINGO were unlawful, malicious, deceptive, defamatory, slanderous, fraudulent and contrary to principles of fairness and common decency.

125.     Mars, Inc. manager, KENCO intentionally misrepresented to Plaintiff his job's compensation as the prevailing wage and that they had conducted a fair and impartial investigation regarding the various disparate and disparaging complaints waged. This was not the case. Moreover, RINGO, upon information and belief, alleges that other similarly situated, non-black, non-African American co-workers were subjected to such treatment.

126.        Mars, Inc. manager, KENCO has an admitted history of disparate and disparaging treatment and impact upon African Americans in the Eastern Court of Virginia-Case number 3:10-cv-00668.